# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :

          v.           :        CRIMINAL NO. 16-22

TAO LI               :

## GOVERNMENT'S SENTENCING MEMORANDUM

*Trade secrets are a form of intellectual property that allow for the legal protection of commercially valuable, proprietary information and make up an increasingly important part of American companies' intellectual property portfolios. Comprising all types of financial, scientific, technical, engineering, or other forms of information, trade secrets are an integral part of the operation, competitive advantage, and financial success of many U.S.-based companies.*

*The growing importance of trade secrets as a form of intellectual property makes their theft a particularly economically damaging crime. In a recent report, the Commission on the Theft of American Intellectual Property estimated that annual losses to the American economy caused by trade secret theft are over $300 billion, comparable to the current annual level of U.S. exports to Asia. This same report found that trade secret theft has led to the loss of 2.1 million American jobs each year and that the illegal theft of intellectual property is undermining the means and incentive for entrepreneurs to innovate. This in turn is slowing the development of new inventions and industries that could raise the prosperity and quality of life for everyone. In another study, Pricewaterhouse-Coopers LLP and the Center for Responsible Enterprise and Trade found that the annual cost of trade secret theft may be as high as $480 billion.*

*Protecting trade secrets has become increasingly difficult given ever-evolving technological advancements. Thieves are using increasingly sophisticated methods to steal trade secrets and the growing use of technology and cyberspace has made trade secret theft detection particularly difficult. The growing problem of trade secret theft has been acknowledged by industry, Congress, and the administration—with Attorney General Eric Holder stating during a White House conference in 2013, "There are only two categories of companies affected by trade-secret theft: those that know they've been compromised and those that don't know yet."*

Senate Committee Report on the Defend Trade Secrets Act of 2016, pages 1-2.

## I.    <u>Introduction</u>

The United States of America, by its attorneys Jennifer Arbittier Williams, Acting United States Attorney for the Eastern District of Pennsylvania, and Robert J. Livermore and Katherine E. Driscoll, Assistant United States Attorneys, respectfully represents as follows:

On September 14, 2018, the defendant TAO LI entered his guilty plea to Count Two of the superseding indictment, conspiracy to steal trade secrets.    TAO LI is scheduled to be sentenced on March 23, 2021 before the Honorable Joel H. Slomsky.    Pursuant to the negotiated plea agreement which dismissed the remaining counts, the statutory maximum penalty that the Court can impose is ten years in prison and the government agreed not to recommend more than seven years in prison.    For the reasons discussed in this memorandum, the government recommends that the Court impose a sentence of seven years in prison.    The government does not recommend imposing a fine, but restitution in this case is mandatory, and includes an amount equal to the fair market value of the stolen trade secrets and approximately $394,406.93 in costs to GSK.    As the Presentence Report reflects that the defendant has substantial assets and income, the Court should also order TAO LI to repay the CJA fund for all, or a portion of, the CJA expenses incurred.

Finally, the government is seeking forfeiture of three items: (a) all funds up to $50,000 in the Bank of America account for Humanabio, Inc.; (b) all personal e-mail accounts used by the defendants to send and receive the trade secret information; and, (c) RENOPHARMA's website, www.renopharma.com.    The government's motion for forfeiture and a proposed order will be submitted separately.

## II.   **Facts of the Case**

This is one of the largest theft of trade secrets cases in United States history.   During the offense conduct, YU XUE and two of her friends, TAO LI and YAN MEI, created a company in China called RENOPHARMA, which intended to research and develop monoclonal antibodies products.   Monoclonal antibodies products are used to treat cancer and other serious diseases. A successful monoclonal antibody product can be worth hundreds of millions or often billions of dollars.   To launch RENOPHARMA, YU XUE stole hundreds of scientific documents from her employer, GSK, some of which contained GSK trade secrets, and sent those documents to her co-conspirators TAO LI and YAN MEI.   The trade secret material contained information regarding multiple biopharmaceutical products under development, GSK research data, and, most importantly, GSK's processes regarding the research, development, and manufacturing of biopharmaceutical products, including monoclonal antibodies.   YU XUE typically sent the documents via e-mail or transferred the documents to TAO LI and YAN MEI via portable electronic storage devices.   The information stolen from GSK gave RENOPHARMA a significant scientific competitive advantage in monoclonal antibody development.   Until this conspiracy was interrupted by the FBI, RENOPHARMA, using GSK's scientific information, intended to develop one or more monoclonal antibody products which RENOPHARMA could have sold for hundreds of millions or even billions of dollars.

RENOPHARMA also received support from the Chinese government in this venture to develop biopharmaceutical products.   For example, in an e-mail exchange between TAO LI and an associate in China, TAO LI described RENOPHARMA as follows: "The name of my company is Nanjing RenoPharma Inc.   It's located at Nanjing, a city in Eastern China, about

150 miles away from Shanghai. So far the company is running well. The major funding was from two private investors. We got some supports from the government, including some national awards and extra funding, tax waiver, and a free 4000 sqf lab space." During this time period, TAO LI used GSK's research data to solicit funds from investors in China.

According to a Chinese government news article in August 2015, TAO LI was identified as having returned to China for a business start-up after having spent more than 10 years studying and working in the U.S. The article states TAO LI, "founded RENOPHARMA Inc. in Nanjing, which is focusing on research and development of antibody drug." The article continues, quoting TAO LI as saying, "In these two years in China, governments in different levels have helped us a lot. This confirmed [to] us that the road we chose is right." TAO LI further states in the article that, "he has received almost 2 million yuan [about $300,000 depending on the volatile exchange rate] financial support from governments in different levels in Nanjing, Jiangsu province. Moreover, his company is enjoying many benefits like first two-year office area for free and bank loan convenience."

### C. Theft of Trade Secrets

GSK's trade secrets and other confidential information were a critical component to the formation of RENOPHARMA. RENOPHARMA did not have the funds, resources, or personnel to develop their own monoclonal antibodies. The only member of RENOPHARMA with significant experience in monoclonal antibody development was YU XUE - and she remained a full-time employee of GSK. In order to get RENOPHARMA off the ground and obtain new investor funds, they had to steal information from GSK. Without the stolen information, RENOPHARMA would literally have nothing. With the stolen information,

RENOPHARMA was able to obtain new investor funds and government grants and began the process of developing monoclonal antibodies. The stolen information also provided RENOPHARMA a roadmap on how to develop monoclonal antibodies, saving them years of scientific research and expenses.

YU XUE sent the GSK trade secret documents to TAO LI and YAN MEI with the intention to convert GSK's information to the economic benefit of themselves and RENOPHARMA. The defendants intended to use GSK's procedures for creating new biopharmaceutical products, called "platforms," as part of RENOPHARMA's drug development projects. By using GSK's platforms, RENOPHARMA could produce any kind of biopharmaceutical product they wished. GSK invested more than twenty years of work and hundreds of millions of dollars to build these platforms through a lengthy process of trial and error. By stealing these platforms, RENOPHARMA obviated the need to undergo the same time and expense which GSK incurred. RENOPHARMA then used these platforms to attempt to develop their own biopharmaceutical products. RENOPHARMA also attempted to use the platforms to negotiate lucrative consulting agreements with other companies to assist them develop biopharmaceutical products using GSK's platforms.

Furthermore, the defendants marketed certain GSK biopharmaceutical products under development as RENOPHARMA products. In some instances, the defendants simply deleted the name "GSK" on scientific documents and replaced it with the name "RENOPHARMA." The end goal for RENOPHARMA was to monetize the GSK stolen data by selling RENOPHARMA to, or partnering with, a large biopharmaceutical company for a substantial up-front payment. According to internal RENOPHARMA documents seized by the FBI, the

defendants believed that RENOPHARMA would be acquired for a payment between $200 million and $2.2 billion. Fortunately, the FBI arrested the defendants before those plans could materialize.

Moreover, YU XUE and TAO LI fully understood what they were doing was illegal and they discussed the criminal nature of their actions on e-mail communications. For example (emphasis in italics added):

- On August 17, 2015, YU XUE e-mailed to TAO LI and YAN MEI a 17-page "RENOPHARMA" report which actually contained GSK information. The report contained information on a specific product being developed by GSK for anti-cancer treatment. The report described the biology of the product and how it worked. The report contained a note which read, "*Be careful. GSK data.*"

- On February 17, 2014, YU XUE e-mailed a confidential GSK report from her GSK e-mail account to her personal e-mail account. Later that evening, YU XUE e-mailed the same document from her personal e-mail account to YAN MEI. YAN MEI then forwarded the same document to TAO LI on the same date. The document was a quality control report on a specific GSK biopharmaceutical product. The bottom of each page was marked "*confidential.*" At the top of the first page, the document stated, "If this template is used to provide information to external 3rd party, seek prior approval . . . ."

- On January 19, 2014, YU XUE e-mailed two GSK documents to TAO LI. TAO LI then forwarded those documents on the same day to YAN MEI. Knowing that the document contained highly confidential GSK trade secret information, in the body of the e-mail, YU XUE instructed TAO LI, "*Please do not spread. Thank you.*"

- On June 20, 2012, YU XUE messaged with TAO LI about a draft RENOPHARMA document which they intended to use to market the stolen data at a pharmaceutical convention. YU XUE instructed TAO LI to delete a reference to "philadelphia PA" on the document. TAO LI asked, "why?" YU XUE replied, "Alot of people from GSK attend [sic]" the conference – demonstrating her concern that the stolen data might be traced back to her.

- On June 28, 2012, TAO LI sent an e-mail to YU XUE which stated, "We 4 [TAO LI, YU XUE, YAN MEI, and another] may need [to] discuss together about the organization of the company [RENOPHARMA] . . . . You [YU XUE] are the core person in this project and you need to think about how to protect yourself." In other words, YU XUE was the "*core person*" because she was the only one in a position to steal GSK data. TAO LI

wanted to discuss with his conspirators how they were going to protect themselves from being apprehended by law enforcement.

- On July 2, 2012, YU XUE messaged with TAO LI and stated that she would send HER and EGFR "stuff" [monoclonal antibodies information] from her "personal computer[.]" TAO LI replied, "OK." YU XUE stated that it was too dangerous to send this data from "the company[.]" TAO LI replied, "*yeah, we should be very careful*." Thus, YU XUE intended to send proprietary GSK research data relating to HER or EGFR receptors from her home computer, rather than her office computer, because she was concerned that she might get caught stealing this data from GSK. Acknowledging their criminal conduct and the conspiracy, TAO LI agreed.

- On July 3, 2012, YU XUE messaged with TAO LI. TAO LI asked YU XUE if she had time to talk on the phone. YU XUE replied that she did. TAO LI asked YU XUE, "is it ok to call your office? People around you?" YU XUE replied that it was acceptable for her to talk because she had her "own office." YU XUE then stated, "*hopefully nobody listen the phone* [sic]."

- On July 31, 2012, YAN MEI messaged with LUCY XI about YU XUE's future plans. LUCY XI told YAN MEI that YU XUE intended to quit her job at GSK in one or two years. LUCY XI explained that YU XUE wanted to "*get the money first*." YAN MEI replied, "that is our plan" – meaning that once the stolen GSK data was resold, all of the conspirators will have enough money to quit their jobs.

- On August 28, 2012, YAN MEI messaged with LUCY XI about YU XUE. LUCY XI complained to YAN MEI that YU XUE had been "annoying" her recently. YAN MEI counseled LUCY XI, "don't lose [your] temper" with YU XUE. LUCY XI replied, "I won't . . . she is the *queen*."

- On October 11, 2012, YU XUE messaged TAO LI regarding sending GSK material to another company and stated, "I suggest do not send any email to them. we can TC [teleconference] but do not send them." In other words, YU XUE did not want TAO LI to forward a trade secret or confidential GSK presentation to someone outside of RENOPHARMA. YU XUE suggested that they have a teleconference instead. A few minutes later, TAO LI messaged with YU XUE about the same presentation. YU XUE indicated that she was not "comfortable" sending the stolen file to another company in China. YU XUE instructed TAO LI, "do not give any slide copy to them" because it was "*too dangerous*." Thus, YU XUE was reluctant to turn over the stolen GSK PowerPoint presentation to a third party for fear that she might get caught.

- On January 15, 2013, TAO LI messaged with YU XUE. YU XUE told TAO LI that she "got detailed information [from GSK] about how to sequence mouse antibody in hybridoma cells." YU XUE told TAO LI that she would send him that information

"from her home computer tonight."   TAO LI instructed YU XUE, "Let me get it next time I visit you.   *Don't forward using e-mails*."   In other words, TAO LI cautioned YU XUE not to send the trade secret information by e-mail and stated that he would pick up that information in person to prevent them from getting caught sending the stolen GSK data.

- On April 2, 2013, TAO LI sent an e-mail to YAN MEI about a researcher in Wisconsin who was charged with stealing details of a cancer-fighting compound.   YAN MEI replied, "*This sounds scary*."   Thus, TAO LI sent the e-mail as a warning to his conspirators that they needed to be careful stealing GSK data to prevent themselves from being caught.

- On October 11, 2013, YU XUE sent TAO LI and YAN MEI an e-mail with a link to a newspaper article about an Eli Lilly scientist indicted for stealing trade secrets.   Thus, YU XUE sent the e-mail as a warning to her conspirators that they needed to be careful stealing GSK data to prevent themselves from being caught.   In a subsequent exchange of messages later that day, YU XUE warned TAO LI that "all GSK [employees] had a meeting this morning – presumably to discuss data protection in light of the Eli Lilly case.   YU XUE stated that GSK set up a "hotline" – presumably for GSK employees to report data breaches.   YU XUE then commented "*so scary*" demonstrating her fear of being caught for stealing GSK proprietary data.   YU XUE then instructed TAO LI, "*Please do not send any DOc contained* [sic] *GSK data out*" and "*DO not mention Her3* [human receptor research]."   On the same day, LUCY XI sent YAN MEI a similar article about the Eli Lilly scientist's indictment as a warning about his criminal conduct.

## III.   Government's Objections to the Presentence Report

As calculated by the Presentence Report, the defendant's base offense level is a 6, with a 2-level enhancement for theft of trade secrets, and a 2-level reduction for acceptance of responsibility resulting in a total offense level of 6.   The defendant is a Category I offender, resulting in a guideline range of 0 to 6 months.

As described herein, the government objects to these calculations.   As calculated by the government, the defendant's offense level should be increased by 30 levels because the fraud loss exceeded $550 million.   The defendant should also receive a 2-level enhancement because a substantial portion of the fraud scheme was operated overseas.   He should receive a 3-level

reduction for acceptance of responsibility.   Therefore, the total offense level should be a 37, and the recommended guideline range should be 210 to 262 months in prison.

## A.    The Fraud Loss Exceeded $550 million

Beginning on April 30, 2019, the Court held a three-day hearing during which various witnesses from both parties provided evidence concerning the Sentencing Guidelines fraud loss calculations.   The government averred that the fraud loss under the sentencing guidelines amounted to more than $1 billion, while the defendants argued that the fraud loss should be $0. On September 22, 2020, the Court issued its Opinion and found that the fraud loss under the sentencing guidelines was $0.

The government respectfully maintains its objections to the Court's factual findings and conclusions of law.   Given the circumstances in this case, a finding of $0 fraud loss gives the defendants and other similarly situated criminals a license to steal highly valuable trade secrets in direct contravention to the applicable laws designed to protect trade secrets and punish those who steal them.

### 1.    GSK did suffer a loss

The finding of a $0 fraud loss is the result of a misapplication of the law.   The Court erroneously focused on the actual, tangible, financial loss to GSK.   The overall misunderstanding of the Court can best be summarized in one phrase from the Court's opinion, "the victim of a trade secret theft may not lose the stolen property."   Opinion at 42.   To the contrary, trade secret theft *is* theft.   Once stolen, the trade secrets *are* lost.   The victim company may continue to use that technology, but the value of a trade secret to its owner is the *exclusive* use of that trade secret which the owner has developed.   If other companies are using the same

technology, it is no longer a trade secret.

In this case, what was stolen was GSK's intangible intellectual property. That property had value and that theft constituted a loss. GSK developed the stolen trade secrets at considerable expense. The loss in this case is GSK's intangible right to the exclusive use of these trade secrets which they developed. TAO LI knew that the stolen trade secrets were incredibly valuable because he projected that RENOPHARMA would be worth hundreds of millions of dollars in a few years. In receiving these trade secrets and other confidential information from GSK, TAO LI acted purposefully to use information he knew did not belong to him. According to his own statement in the PSR, TAO LI admitted that he knew that YU XUE had a "conflict of interest" in working for GSK and RENOPHARMA. As soon as TAO LI received the GSK trade secrets, there was no way to undo this harm - the trade secrets were lost and GSK suffered a loss which can be quantified under the sentencing guidelines.

As the bipartisan Senate report quoted above more fully describes, the losses from trade secret theft are not incurred instantaneously. When someone robs a bank of $50,000 in cash, the bank performs an audit and determines the loss immediately. When someone steals trade secrets from a corporation, that loss is not necessarily instant. Trade secret theft can cause a slow erosion of the technological advantages developed over time, which eventually causes jobs to be lost and profits to dwindle. The fact that the loss does not immediately show up on the company's financial reports does not mean that the company did not suffer a tremendous loss - and a loss which can be quantified under the sentencing guidelines.

As the Court noted, Opinion at 34, intended loss is the amount the defendant actually intended to impose on the victim, regardless of whether the loss actually materialized or was

even possible.   The facts here are clear.   TAO LI admitted that he received stolen trade secrets and other propriety information belonging to GSK.   He knew this proprietary information was very valuable and planned to earn hundreds of millions of dollars by using this information to develop monoclonal antibodies.   Thus, the fair market value or the development cost of that proprietary information is the intended loss under the guidelines.   The Court's finding that TAO LI received stolen GSK's trade secrets for his own financial benefit, without intending for GSK to suffer a loss of their exclusive right to use those trade secrets is clearly erroneous and not supported by the uncontroverted evidence in this case.

   As the government acknowledged during the valuation hearing, computing the fair market value of the stolen information and the development costs is an extremely challenging problem because none of the information was ever intended to be sold.   There is no "fair market" for these trade secrets.   Reasonable minds can differ as to their exact value, but there is no question that the value of the property stolen and the corresponding loss of intellectual property to GSK was far greater than $0.

### 2.        The Court misapplied <u>United States v. Pu</u>

The Court's opinion on fraud loss relied in large part on <u>United States v. Pu</u>, 814 F.3d 818 (7th Cir. 2016).   In making its decision, the Court misunderstood and misapplied the holding of <u>Pu</u>.   While both <u>Pu</u> and this case involve the theft of trade secrets, a closer examination of the facts suggests that Pu's criminal conduct was quite different from the admitted criminal conduct here, and that the Seventh Circuit's legal analysis in <u>Pu</u> actually supports the government's position on the sentencing guidelines fraud loss computations.

In <u>Pu</u>, the victim corporation (a hedge fund) created a proprietary computer program to

trade securities.   As part of this computer program, algorithms were generated that contained computerized instructions of when to trade securities during a specific time period.   The defendant, Pu, stole the results or outputs of these algorithms.   Id. at 821-22.   There was little evidence as to what Pu intended to do with this proprietary information once he stole it.   Id. at 825-26.[1]   Critically, the defendant did *not* attempt to steal the recipe or the source code for his employer's computer program.   Id. at 827.   The defendant only stole some results generated therefrom.   Id.   The Seventh Circuit certainly indicated that, had the defendant stolen the source code, its result would have been different.   See id. at 827 (finding the appeal meritorious "because Pu only stole the outputs the source code generated, not the actual source code").

In this case, YU XUE stole, and TAO LI received, GSK's platforms or recipes to make the monoclonal antibodies, which is analogous to the source code in Pu.   TAO LI sought to use these recipes to give RENOPHARMA a competitive edge - the "fast way to produce a real drug in China" - as he detailed in an e-mail describing RENOPHARMA.   Thus, if the Seventh Circuit were confronted with the facts at bar, under Pu, the Seventh Circuit would determine that the fair market value or the development cost would be an appropriate factor to consider when calculating the fraud loss.   YU XUE's conduct included what the defendant in Pu did - she used GSK's proprietary computer systems to run protein sequences on antibodies being developed by RENOPHARMA - sequences which she then e-mailed to TAO LI.   Under the law, those protein sequences are the intellectual property of GSK.   The government did not even attempt to

---

[1]      In summarizing Pu in its September 22, 2020 Opinion, the Court stated that Pu used the stolen data to conduct personal computerized stock market trades and lost $40,000.   That was certainly one theory of the case presented by the government, but both the district court and the Seventh Circuit seemingly rejected that theory in other portions of the Seventh Circuit's decision, as will be discussed *infra.*

quantify the loss for that portion of the conduct because the value of that information would have been *de minimis* in comparison to more valuable information stolen. Instead, the crux of the government's calculations for YU XUE and TAO LI concerned recipes and platforms - analogous to the source code - which was not stolen in Pu. Therefore, the theft in Pu was quite different from the theft in this case and a correct application of the holding in Pu in fact supports the government's position on the fraud loss calculation.

Furthermore, a critical component of the Seventh Circuit's decision in Pu was that the district court found that the government had failed to present "sufficient evidence of a greater plan than what Pu actually achieved." Id. at 823. There were some arguments presented by the government that Pu may have used the algorithms to conduct his own trades, but the district court rejected the government's theory of the case by finding, "there is no solid evidence to indicate that [Pu] would have used these secrets to try to help [himself] to improve [his] financial situation." Id. at 825-26. There was no evidence that Pu formed his own company, tried to sell the stolen data, or tried to further develop the stolen information. See id. at 826-27 (there was "insufficient evidence of a grander scheme that was interrupted.") In other words, Pu simply stole some data from his employer and sat on it. There was no evidence that Pu had a plan or scheme to profit from the stolen information, according to the district court's finding. Given the lack of evidence of any plan to use the stolen information, it is not surprising that the Seventh Circuit found that there was no evidence that Pu intended to inflict any losses on his employer.

In stark contrast, YU XUE and TAO LI conspired to profit from the stolen GSK information through the grandest of schemes. They formed their own company, tried to sell the stolen data, and tried to further develop the stolen information. TAO LI marketed GSK's

13

monoclonal antibodies as belonging to RENOPHARMA. TAO LI used GSK's data by simply copying and pasting GSK PowerPoint slides. RENOPHARMA marketing materials showed that YU XUE and TAO LI intended to make hundreds of millions of dollars off the stolen GSK information. None of that evidence was presented in Pu. As a result, the Seventh Circuit came to a different result. Had Pu taken the same actions as the defendants in this case, the Seventh Circuit undoubtedly would find a quantifiable fraud loss under the sentencing guidelines.

The evidence in Pu was that Pu stole the data but made no effort to capitalize on the stolen information. In a similar manner as Pu, there was evidence here that YU XUE possessed a considerable amount of additional proprietary GSK data on her home computers - data which was not transmitted to RENOPHARMA. However, that information was not used in the government's fraud loss calculations for YU XUE or TAO LI. The government's fraud loss calculations were instead based on the GSK proprietary information which YU XUE actually sent to TAO LI and RENOPHARMA. In applying Pu, the district court might fairly conclude that the data found on YU XUE's home computer, which was not transmitted to RENOPHARMA, might not be part of the fraud loss figures because there was no evidence that YU XUE intended GSK to suffer a loss from that data. However, for the data that YU XUE actually transmitted to TAO LI and RENOPHARMA, the Seventh Circuit would clearly agree that these trade secrets were "lost" by GSK and should be accounted for in the sentencing guidelines fraud loss computations.

For these reasons, the government believes that the Court misapplied the holding in Pu, and that the Court's conclusion that there was no quantifiable fraud loss under the sentencing guidelines was incorrect.

### 3.     The cost of development is an appropriate loss amount for theft of trade secrets

The issue in <u>Pu</u> was a factual determination of what, if anything, that defendant intended to do with the stolen information, not whether development costs were appropriate in theft of trade secret cases.   The court in <u>Pu</u> found that Pu only intended to possess the stolen information and not use it for his own profit.   To the contrary, the Seventh Circuit in <u>Pu</u> and other courts from across the country support using the "intended loss" and "development cost" approach as the government offered in this case when there is evidence, as here, that the defendant attempted to profit from the stolen trade secret information.

- In <u>United States v. Nosal</u>, No. CR-08-0237 EMC, 2014 WL 121519, at *3 (N.D. Cal. Jan. 13, 2014), the defendant unlawfully accessed a proprietary database owned by his former employer and copied data therefrom.   The district court found that development costs of the database were properly considered in the loss calculation under the Guidelines.   <u>Id.</u>

- In <u>United States v. Shan Shi</u>, No. 17-CR-110 (CRC), 2019 WL 6879409, at *3 (D.D.C. Dec. 17, 2019), the defendant stole trade secrets from the victim corporation related to foam products used in offshore drilling operations. However, the victim corporation did not suffer any actual loss from the theft. The district court rejected defense counsel's argument[2] that the government had to prove that the defendant intended to cause specific harm to the victim corporation. In applying the government's "intended loss" analysis, the district court found, "While such [direct intent] evidence would strengthen the government's case, it is not required for the Court to find, by a preponderance of the evidence, that Dr. Shi intended to cause pecuniary harm to Trelleborg [by stealing trade secrets]. As discussed above, a court is permitted to make reasonable inferences based on the defendant's conduct in order to assess mens rea."   <u>Id.</u>

- In <u>United States v. Ameri</u>, 412 F.3d 893, 900 (8th Cir. 2005), the defendant stole software used to make driver's licenses from the State of Arkansas.   The district court found that the fair market value of the software was difficult to determine since it would never been sold.   Thus, the district court used the development cost of the software to computer the fraud loss under the sentencing guidelines.

---

[2]     The defendant in this case was also represented by Peter Zeidenberg, Esq.

####     4.        Renopharma did incur a gain

The Court found that the defendants incurred no "actual gain" and that RENOPHARMA

incurred a loss of $400,000.   Opinion at 32, n.28.   In the government's view, the Court's factual

finding is incorrect.   This is a theft of trade secrets case.   When YU XUE stole the trade secrets,

GSK lost the value of the trade secrets and RENOPHARMA gained the value of the trade

secrets.   RENOPHARMA could, and did, use that GSK proprietary information to further its

business and the development of monoclonal antibodies.

Dr. Villafranca testified how the stolen information could help a small company like

RENOPHARMA develop monoclonal antibodies.   In addition to providing specific information

on specific drug candidates, the stolen documents provided RENOPHARMA with the entire

platform or roadmap for developing monoclonal antibodies.   Transcript 5/12/19 at 12.   For

example, the stolen documents showed RENOPHARMA what tests to perform and how to

perform them.   Id.   Dr. Villafranca further noted that the stolen information would be useful to

RENOPHARMA to develop any kind of monoclonal antibody they wished.   Id. at 19.

According to internal RENOPHARMA documents prepared by TAO LI,

RENOPHARMA's ultimate goal was not necessarily to develop an FDA-approved drug, but to

develop a viable drug candidate that would cause a larger company to be interested in either

purchasing RENOPHARMA outright or making a substantial investment in RENOPHARMA.

As Dr. Villafranca explained, that type of partnership was very common in the industry.   Id. at

33.   Large companies often pay small companies hundreds of millions or even billions of dollars

for viable drug candidates.   Id. at 33-34.   The fact that the stolen GSK information, specifically

the platforms, could provide RENOPHARMA with a roadmap to develop several viable

monoclonal antibody candidates, is precisely the reason why the defendants stole it. That

information was incredibly valuable and RENOPHARMA incurred a substantial gain when the

defendants stole it.

The sentencing guidelines specifically take the fair market value of the loss/gain into

account in formulating the fraud loss. Under the guidelines, the Court must take into account

the "fair market value of the property unlawfully taken." USSG § 2B1.1, Application Note

3(C)(i). As the Court noted, the Sentencing Guidelines' commentary is binding. United States

v. Geevers, 226 F.3d 186, 190 (3d Cir. 2000). Citing Pu, the Court found that the defendants

failed to show that the victims suffered a loss equal to the fair market value or development cost.

Opinion at 37. As discussed above, the Seventh Circuit in Pu would clearly apply the fair

market value or development cost in this case because the defendants engaged in a clear scheme

to defraud. The defendants stole the trade secrets to advance the work of RENOPHARMA.

Therefore, the clear and obvious loss in this case is the fair market value or the development cost

of the stolen trade secrets.

### B.  A substantial portion of the fraud scheme was located outside the United States, and the defendants used sophisticated means to effectuate the scheme

USSG § 2B1.1 (b)(10) provides:

If (A) the defendant relocated, or participated in relocating, a fraudulent scheme
to another jurisdiction to evade law enforcement or regulatory officials; (B) a
substantial part of a fraudulent scheme was committed from outside the United
States; or (C) the offense otherwise involved sophisticated means and the
defendant intentionally engaged in or caused the conduct constituting
sophisticated means, increase by 2 levels. If the resulting offense level is less than
level 12, increase to level 12.

This enhancement "punish[es] multi-jurisdictional criminal enterprises and criminal

methods that prevent detection by law enforcement." United States v. Lyles, 506 F. App'x. 440,

447 (6th Cir. 2012). The Guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense[,]" including perpetrating a scheme across multiple jurisdictions or using shell companies. USSG § 2B1.1 cmt. n.9(B). The enhancement is appropriate when "a defendant's conduct 'shows a greater level of planning or concealment than a typical fraud of its kind.'" United States v. Fountain, 792 F.3d 310, 319 (3d Cir. 2015) (quoting Fumo, 655 F.3d at 315). "Determining whether a defendant employed sophisticated means ... involve[s] considering factors like the duration of a scheme, the number of participants, the use of multiple accounts, and efforts to avoid detection." Id. (citation omitted). See United States v. McCullagh, 795 F. App'x 868, 873 (3d Cir. 2019).

This enhancement applies in this case because (1) RENOPHARMA was located in China and (2) the fraud scheme involved sophisticated means. The evidence shows that RENOPHARMA operated in China. Virtually all of its operations were located there. The evidence suggests that the defendants specifically chose to create their business in China in order to hide their criminal conduct from United States law enforcement. Secondly, the fraud scheme involved very sophisticated means. The defendants created a corporation in China to develop the stolen monoclonal antibody information. They hired scientists and other workers to assist them in this venture. They solicited financial support from investors and the government of China. For these reasons, this enhancement is clearly appropriate.

V.    **Defendant's Objections to the PSR**

   A.    **USSG § 2B1.1(b)(14)(A)**

The Presentence Report included a two-level enhancement because the stolen trade

secrets were "transported or transmitted out of the United States."    USSG § 2B1.1(b)(14)(A).

In this case, there is no question that YU XUE e-mailed the stolen trade secrets to TAO LI and

YAN MEI in China and that this enhancement applies.

> In drafting this enhancement, the U.S. Sentencing Commission reported:
>
> The Commission received public comment and testimony that the transmission of stolen trade secrets outside of the United States creates significant obstacles to effective investigation and prosecution and causes both increased harm to victims and more general harms to the nation. With respect to the victim, civil remedies may not be readily available or effective, and the transmission of a stolen trade secret outside of the United States substantially increases the risk that the trade secret will be exploited by a foreign competitor. In contrast, the simple movement of a stolen trade secret within a domestic multinational company (e.g., from a United States office to an overseas office of the same company) may not pose the same risks or harms. More generally, the Commission heard that foreign actors increasingly target United States companies for trade secret theft and that such offenses pose a growing threat to the nation's global competitiveness, economic growth, and national security. Accordingly, the Commission determined that a 2-level enhancement is warranted for cases in which the defendant knew or intended that a stolen trade secret would be transported or transmitted outside of the United States.

Amendment, FCJ Federal Sentencing Guidelines Manual Amendment 771 (11/1/13).    The

offense conduct in this case pertains to the heart of the concerns addressed by the Sentencing

Commission in adopting this enhancement.

While the defendant admits that this enhancement applies, he avers that its application is

inequitable because he did not use or further disseminate the stolen trade secret information.

The defendant's argument is contrary to the facts of the case.    The defendant admitted that he

used GSK's information, including information on GSK's HER-3 product, in the so-called

"marketing materials" which TAO LI used to solicit investments in RENOPHARMA.    The

defendant further admitted that he received and maintained the bulk of the stolen trade secrets in

a folder which he called, "for learning" - and that is exactly what they were used for.    The stolen

GSK trade secret information provided him an advanced education in monoclonal antibody development.   Prior to working for RENOPHARMA, TAO LI had little to no experience with monoclonal antibodies.   The stolen GSK information guided TAO LI and YAN MEI through the complex antibody development process.   This road map saved TAO LI, YAN MEI, and RENOPOHARMA significant time and money.   The stolen GSK information included materials which GSK used to train its own scientists on the development of monoclonal antibodies.   As Dr. Villafranca testified, the stolen GSK platforms would be useful and applicable for developing any monoclonal antibody which RENOPHARMA wished to develop.

For these reasons, this enhancement applies both legally and equitably.

## B.    Restitution

The defendant also objects to the court ordering any restitution in this case by arguing that GSK did not suffer any loss as a result of the defendant's conduct.   In support of his argument, the defendant cited to United States v. Silkowski, 32 F.3d 682, 688-89 (2d Cir. 1994).   However, the offense conduct in Silkowski predated modifications to the Victim and Witness Protection Act (VWPA) of 1990.   Prior to 1990, the VWPA authorized restitution for losses caused only by the offense of conviction, absent an express agreement to the contrary.   See id. at 689 (citing Hughey v. United States, 495 U.S. 411, 413 (1990)).   Obviously, an old law from prior to 1990 has no impact on this case which took place more than twenty years later.[3]

---

[3]      The defendant also cited to United States v. Anderson, 483 F. App'x 433, 437 (10th Cir. 2012) and United States v. Hudson, 483 F.3d 707, 710–11 (10th Cir. 2007).   In Anderson, the defendant pleaded guilty to making false statements to the Social Security Administration in connection with his disability benefits.   However, the Tenth Circuit found that the government had failed to establish that "Anderson received SSDI benefits to which he was not entitled." 483 F. App'x at 440.   Thus, the Tenth Circuit held that the district court erred in requiring Anderson to repay those benefits received.   Id.   In Hudson, the defendant was convicted of attempting to

The Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, *et seq*. (MVRA), governs sentencing in this case. Congress enacted this statute, for convictions occurring after its effective date, April 24, 1996, in response to the deficiencies on the law of restitution in prior legislation and in the Supreme Court's decision in <u>Hughey</u>.

The MVRA specifically directs the courts to order a defendant to make restitution to the victims of the offense. Restitution for victims of fraud is mandatory. <u>See</u> <u>Lagos v. United States</u>, 138 S. Ct. 1684, 1687, 201 L. Ed. 2d 1 (2018) ("The Mandatory Victims Restitution Act is one of several federal statutes that govern federal court orders requiring defendants convicted of certain crimes to pay their victims restitution.") The court must order the defendant to pay restitution "in the full amount of each victim's losses." 18 U.S.C. § 3664(f)(1)(A). "The purpose of restitution under the MVRA is to compensate the victim for its losses and, to the extent possible, to make the victim whole." <u>United States v. Diaz</u>, 245 F.3d 294, 312 (3d Cir. 2001). The MVRA also defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(2). The statute expressly provides that "in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern" is a victim. 18 U.S.C. § 3663A. The government bears the burden to prove by the preponderance of the evidence "the amount of the

---

sell counterfeit Microsoft products. The Tenth Circuit found that the district court erred by ordering the defendant to repay Microsoft because his conduct potentially could have deprived Microsoft of actual sales - although there was no evidence to establish that fact. 483 F.3d at 711. The case at bar does not involve social security benefits and the government is not seeking restitution for the defendants depriving GSK of potential sales. For these reasons, neither <u>Anderson</u> nor <u>Hudson</u> should guide the Court's restitution analysis here.

loss sustained by a victim as a result of the offense."   18 U.S.C. § 3664(e).   "Any dispute as to

the proper amount or type of restitution shall be resolved by the court by the preponderance of

evidence."   Id.

Because the defendant was convicted of a Title 18 offense against property involving

fraud, this Court must impose restitution in the amount of the victim's loss, which, here,

represents "the value of the property on the date of the damage, loss, or destruction."   18 U.S.C.

§ 3663A(b)(1); accord Lagos, 138 S. Ct. at 1687.   The MVRA also requires that restitution

awards "reimburse the victim for lost income and necessary child care, transportation, and other

expenses incurred during participation in the investigation or prosecution of the offense or

attendance at proceedings related to the offense."   18 U.S.C. § 3663A(b)(4).

Here, pursuant to the MVRA, the government seeks restitution in the amount of

$1,072,576,000, which represents the fair market value of the stolen GSK trade secrets and other

proprietary information at the time that information was stolen.   The Court should also order

restitution in the amount of $394,406.93 to GSK for other expenses incurred during participation

in the investigation or prosecution of the offense or attendance at proceedings related to the

offense.   The vast majority of the expenses incurred by GSK in this investigation and

prosecution were directly attributable to legal motions and process filed by the defendants.   The

defendants vigorously contested the discovery protective order.   The defendants subpoenaed

GSK and the Court required GSK to submit certain documents in camera.   All of these actions

on the part of the defendants contributed to GSK's legal costs.   Under the law, GSK is entitled to

receive restitution for those costs incurred during this investigation and prosecution.

## VI.    Government's Motion for an Upward Departure

One of the purposes of the sentencing guidelines is to "reflect the seriousness of the offense."   18 U.S.C. § 3553(a)(2); accord Gall v. United States, 552 U.S. 38, 39 (2007).   The guidelines are calibrated so that more egregious criminal conduct earns a more severe sentence. One of the consequences of the Court's Opinion on the fraud loss is that the guideline range for the defendants in this case is no longer calibrated based upon the severity of the offense conduct. If the Court does not reconsider its view that the Guidelines loss in this case is zero, TAO LI, who received hundreds of incredibly valuable stolen documents, would face the same recommended sentencing guideline range as another defendant who stole a single less valuable document.   The government, thus, moves for an upward departure to address this inequity.

In these instances, the guidelines suggest that a departure is warranted.[4]   For these reasons, the government moves for an upward departure pursuant to USSG §§ 5K2.0(a)(2)(A), (a)(2)(B), and (a)(3).   USSG § 5K2.0(a)(2)(A) provides that an upward departure may be appropriate if an identified circumstance (i.e., fraud loss) has not adequately been taken into consideration in determining the applicable guideline range.   USSG § 5K2.0(a)(2)(B) provides that an upward departure may be appropriate if an unidentified circumstance (i.e., fraud gain) has not been identified in the guidelines, but that nevertheless is relevant to determining the appropriate sentence.   USSG § 5K2.0(a)(3) provides that an upward departure may be

---

[4]     Federal Rule of Criminal Procedure 32(h) states that "[b]efore the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission, the court must give the parties reasonable notice that it is contemplating such a departure."   United States v. Andre, 600 F. App'x 824, 826 (3d Cir. 2015).   The government avers that the filing of this sentencing memorandum provides the defendant with the required notice.

appropriate if the court determines that a circumstance (i.e. fraud loss) present in the offense to a degree substantially in excess of that which ordinarily is involved in the kind of offense.  See United States v. Ross, 350 F. App'x 686, 688 (3d Cir. 2009).

In this case, the Court specifically commented on the obvious inequity of its own guidelines calculation, acknowledging that, "the outcome here may seem discomforting." Opinion at 3.  The Court further commented, "None of this is to say that the stolen information was worthless.  It [is] clear that GSK invested considerable resources to develop the misappropriated information."  Opinion at 44.  In so doing, the Court recognized the inherent unfairness of its interpretation of the fraud loss guidelines.  The Court's finding that the fraud loss amounted to $0 simply does not adequately account for the serious criminal conduct involved.  In this instance, an upward departure under the sentencing guidelines is warranted. TAO LI received stolen information which was incredibly valuable, and he should be held accountable for the seriousness of that conduct under the sentencing guidelines.

When determining the degree of the upward departure, the Court is bound to examine the most analogous sentencing guideline provisions.  See United States v. Baird, 109 F.3d 856, 872 (3d Cir.1997); United States v. Ross, 350 F. App'x 686, 689 (3d Cir. 2009).  In this case, the most analogous sentencing guideline provision would be USSG § 2B1.1.  Thus, under the sentencing guidelines, even if the court rejects the government's arguments under USSG § 2B1.1 in the first instance, the guidelines loop the Court back to USSG § 2B1.1 in the second instance. The guidelines would then recommend a 30-level departure commensurate with USSG § 2B1.1 or whatever level departure corresponding to the fair market value or the development cost of the stolen trade secrets.

For these reasons, the government moves the Court to impose an upward departure under the sentencing guidelines commensurate with the fair market value or the development cost of the stolen trade secrets in order to properly account for the defendant's serious criminal conduct.

## VII. Government's Motion for an Upward Variance

"Departures are enhancements of, or subtractions from, a guidelines calculation based on a specific Guidelines departure provision," while "[v]ariances, in contrast, are discretionary changes to a guidelines sentencing range based on a judge's review of all the § 3553(a) factors and do not require advance notice." United States v. Brown, 578 F.3d 221, 225–26 (3d Cir. 2009). A court is not precluded from deviating from the guidelines range on the basis of a particular factor simply because that fact was also considered in determining the guidelines range. See United States v. Greenidge, 495 F.3d 85, 103 (3d Cir.2007) ("We emphasize that a sentencing court is not prohibited from considering the factual basis underlying a defendant's sentence enhancements, and indeed, should consider those facts in order to tailor the sentence to the defendant's individual circumstances."). In setting forth how a court should respond to a party's request for a variance, the Supreme Court has held that "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision making authority." Rita v. United States, 551 U.S. 338, 356, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007).

In finding the fraud loss to be $0, the Court's opinion stressed that the sentencing guidelines are "only advisory" and "only one factor among many to be considered by the court in fashioning an appropriate sentence." Opinion at 2, n.1.

The government correspondingly moves for an upward variance from the sentencing

guidelines to hold TAO LI accountable for his serious criminal conduct. TAO LI received

stolen trade secrets, which were incredibly value and essential to the vitality of a

biopharmaceutical company. The government calculates the sentencing guidelines to

recommend a sentence of approximately 20 years in prison. In negotiating the guilty plea, the

government has already acknowledged that a sentence in this range would be greater than

necessary to accomplish the goals set forth in 18 U.S.C. § 3553. Pursuant to a plea agreement,

the government agreed to a statutory maximum penalty of 10 years in prison and not to

recommend a sentence of more than seven years in prison. For the reasons stated below, a

sentence of seven years in prison is an appropriate and reasonable sentence when considering all

of the 3553 factors.

## IV. GOVERNMENT'S RECOMMENDATIONS CONCERNING SENTENCING

### A. Background

The Supreme Court has declared: "As a matter of administration and to secure

nationwide consistency, the Guidelines should be the starting point and the initial benchmark."

Gall v. United States, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an

indispensable resource for assuring appropriate and uniform punishment for federal criminal

offenses.

This Court must also consider all of the sentencing considerations set forth in Section

3553. Those factors include: (1) the nature and circumstances of the offense and the history and

characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness

of the offense, to promote respect for the law, and to provide just punishment for the offense; (3)

the need to afford adequate deterrence to criminal conduct, and to protect the public from further

crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553.

### B. Application

The relevant 3553 factors will be discussed in turn.

#### 1. The nature and circumstances of the offense

By participating in a plan to steal and profit from GSK biopharmaceutical trade secret information, TAO LI committed an egregious offense. While YU XUE was the most culpable member of the conspiracy because she betrayed her employer and stole the trade secret information from GSK, TAO LI was the second most culpable member of the conspiracy because he was the one who used the stolen trade secret information on behalf of RENOPHARMA.

YU XUE discussed with YAN MEI and others the various ways they could monetize GSK's intellectual property two years before TAO LI joined the conspiracy. Before TAO LI joined, YU XUE's ideas were nebulous, and the project never materialized. Once TAO LI joined the conspiracy, RENOPHARMA began to move forward and use GSK's trade secret information. TAO LI created PowerPoint slides to market RENOPHARMA to potential investors using the stolen GSK information. TAO LI obtained grant money from the government of China to provide start-up money and resources for RENOPHARMA. Without

TAO LI, the RENOPHARMA conspiracy would not have gotten off the ground.   In this regard, TAO LI was an instrumental member of this criminal venture.

Prior to his participation in the charged conspiracy, TAO LI had little experience with monoclonal antibodies.   Thus, YU XUE sent TAO LI GSK trade secret information to give him a specialized education in how monoclonal antibodies are developed.   Some of the documents he received were materials which GSK used to train their own scientists in monoclonal antibody development.   TAO LI used this research as a guide as he led RENOPHARMA's attempts to develop monoclonal antibodies based on the stolen GSK information.

In evaluating TAO LI's crime, it is important to note what he did not do.   Many people receive e-mails which are superfluous or unimportant.   Those e-mails are quickly deleted. TAO LI did not delete the e-mails which YU XUE sent him.   He kept them, he saved them, and he organized them into one folder on his computer.   He used them for the "marketing materials." When he bought a new computer, he did not discard them, but copied all of them onto his new computer.   He kept them because the e-mails were critical to his work and the development of RENOPHARMA.

The severity of this offense demands a substantial punishment.   As the Senate Report described, this type of criminal activity is far too common and very damaging not only to companies like GSK, but to our economy as a whole.   The government believes that a sentence of seven years in prison is appropriately calibrated to fit the severity of the offense and TAO LI's culpability relative to YU XUE, but is no greater than necessary to accomplish the goals of § 3553.

## 2. The history and characteristics of the defendant

TAO LI was born in China.   He came to the United States to study and received a Ph.D. from the University of North Carolina.   He then went to work for the Salk Institute researching endocrine disruptors before joining RENOPHARMA in 2012.

## 3. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense

In this case, there is a great need for the sentence to reflect the seriousness of the offense. Despite TAO LI's guilty plea, the parties have vastly different views on the seriousness of the offense.   To TAO LI, this case is a technical offense akin to a speeding ticket, as is made clear from his statement in the PSR.   TAO LI's suggestion that he did not use the GSK trade secret material is contrary to the incontrovertible evidence in this case, and to the facts that he pleaded guilty to.   During the valuation hearing, the defense expert witness testified that all of the supposed GSK trade secret information which YU XUE sent to TAO LI could be found in books in his own personal library.   However, if that were really true, then there would have been no need for YU XUE to send TAO LI the GSK trade secret information.   She could have mailed him the books.

The truth of the matter is that the information which YU XUE sent to TAO LI was highly valuable and very applicable to his work at RENOPHARMA.   The GSK information was not some theoretical science from a textbook, but actual, practical descriptions of how monoclonal antibodies are developed by a real biopharmaceutical company.   RENOPHARMA aspired to be a real biopharmaceutical company.   The lessons learned from a college textbook were woefully insufficient in that regard.   TAO LI and RENOPHARMA needed real world experience to

29

develop a real monoclonal antibody product. As Dr. Villafranca testified at the valuation hearing, developing a monoclonal antibody product is an incredibly challenging pursuit and typically costs in excess of $1 billion. TAO LI, with the help of YU XUE, sought to save the time and significant expense associated with monoclonal antibody development, and use the stolen GSK information to leapfrog other pharmaceutical companies in China.

As noted above, TAO LI had no prior experience with monoclonal antibody development. YU XUE needed to send TAO LI the stolen GSK information so that he would understand what RENOPHARMA was supposed to do. TAO LI was the person in China who was managing the day-to-day affairs of RENOPHARMA, including the research of monoclonal antibodies. While some of this work was contracted to third parties, TAO LI still had to direct the third parties what work to perform. TAO LI had to understand the results and make decisions on how to move forward with development. He needed a road map to guide him. That road map was found in his "for learning" folder which contained the GSK trade secret information.

YU XUE and TAO LI stole the GSK information for a specific purpose - to monetize that information for their own pecuniary benefit. The seized documents show that YU XUE and TAO LI planned to sell RENOPHARMA for hundreds of millions of dollars. Correspondingly, GSK had invested hundreds of millions of dollars to develop the platforms and recipes which they stole. This conduct is exactly what Congress intended to criminalize and punish. The magnitude of the theft in this case was tremendous. For these reasons, a sentence of seven years in prison is warranted to adequately reflect the seriousness of the offense.

### 4. The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant

In this case, there is a strong need for general deterrence. Intellectual property theft of this nature is far too common in the biopharmaceutical industry and often goes unreported. The value of general deterrence was seen in this case, as the defendants discussed in an e-mail chain a scientist who was arrested in another case. The defendants discussed their fears that they might be caught and discussed ways to avoid being apprehended by law enforcement.

This is one of the most significant theft of trade secret cases ever prosecuted in the United States. If YU XUE and TAO LI can steal $1 billion worth of intellectual property and receive a lenient sentence, it would only encourage others to do the same. The district court *must* impose a substantial sentence in order to effectively deter this kind of egregious criminal conduct.

### 5. The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.

TAO LI does not appear to need any such training or treatment.

### 6. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

In this case, the government has calibrated its sentencing recommendations according to the defendants' relative offense conduct. The most egregious offender is YU XUE because she was the one who actually stole hundreds of trade secret documents from her employer. The second most egregious offenders are TAO LI and YAN MEI because they intended to profit from the information contained in the stolen documents. In contrast, LUCY XI stole only one trade secret document, while TIAN XUE stole none and received no trade secret documents. The government is recommending a sentence of 10 years for YU XUE, seven years for TAO LI,

and 5 years' probation for TIAN XUE.

Equally important, the Court's sentence must be consistent with the sentences received by similarly situated defendants from across the United States. The purpose of the sentencing guidelines is to provide guidance to the Court in this regard. Given the value of what TAO LI stole, the sentencing guidelines recommend a sentence of approximately 20 years in prison. The government recognizes that a sentence along those lines would be greater than necessary to accomplish the goals of § 3553. However, a substantial sentence is warranted. The government believes that a sentence of seven years in prison is appropriate after considering all of the circumstances of this case.

### 7. Restitution

As noted above, restitution in theft of trade secret cases is required under the MVRA. United States v. Nosal, 844 F.3d 1024, 1046 (9th Cir. 2016). The MVRA requires the sentencing court to impose restitution in the amount of "the value of the property on the date of the damage, loss, or destruction." 18 U.S.C. § 3663A(b)(1). The MVRA also requires that restitution awards "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). Other expenses incurred during the participation in the investigation or prosecution includes investigation costs and attorneys' fees. See, e.g., United States v. Abdelbary, 746 F.3d 570, 574–79 (4th Cir. 2014); United States v. Elson, 577 F.3d 713, 728 (6th Cir. 2009); United States v. Waknine, 543 F.3d 546, 558–59 (9th Cir. 2008); United States v. Amato, 540 F.3d 153, 159–62 (2d Cir. 2008).

Therefore, under the MVRA, the Court must impose restitution for the fair market value of the stolen information and other expenses incurred by GSK. GSK reported expenses of roughly $400,000. As the government expert testified, the fair market value of the stolen information amounted to approximately $1 billion. Obviously, the defendant will never be able to fully repay GSK for the value of what he stole. He does have the ability to pay some funds now, and he may have the ability to pay additional funds in the future. The Court should impose a reasonable payment plan accordingly.

## 8. CJA Fund

The Criminal Justice Act requires district courts to provide legal counsel for criminal defendants charged with a felony when they are unable to pay for an attorney. 18 U.S.C. § 3006A(a)(1)(A). A defendant bears the burden to prove he is unable to pay for the cost of representation. United States v. Evans, 155 F.3d 245, 252 n.8 (3d Cir.1998) (citing United States v. Lefkowitz, 125 F.3d 608, 621 (8th Cir.1997)). "Whenever the United States magistrate judge or the court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid to the appointed attorney, to the bar association or legal aid agency or community defender organization which provided the appointed attorney...." 18 U.S.C. § 3006A(f); accord United States v. Konrad, 730 F.3d 343, 346 (3d Cir. 2013). At the time of sentencing, in appropriate circumstances, the court should order the person to reimburse the CJA appropriation for such costs. Konrad, 730 F.3d at 346 (quoting 18 U.S.C. § 3006A(f)).

Under the law, the Court should order TAO LI to repay the CJA fund for all or part of the expenses incurred. According to the Presentence Report, he has assets worth over $100,000.

His family income is $17,000 per month. The government is not aware of the exact amount billed to the CJA fund by counsel, but TAO LI clearly has assets to pay for all or part of these CJA expenses. The fact that his wife may have an interest in this property as well is irrelevant under Third Circuit law. See Konrad, 730 F.3d at 349.

## V.    CONCLUSION

As set forth in the plea agreement, the government believes that a sentence of seven years in prison is appropriate when considering all of the § 3553 factors. This plea agreement was reached before the Court's opinion on the fraud loss. The government's recommendation at sentencing would not have changed had the Court attributed a specific dollar amount to the fraud loss issue. The government's recommendation is based on the fact that TAO LI's conduct in this case was deliberate and designed to reap hundreds of millions of dollars in profits from the stolen information. But for the actions of the FBI in shutting down RENOPHARMA, he may very well have been successful. Consequently, a seven-year prison sentence is just punishment for his participation in one of the largest, most significant, theft of trade secret cases in the United States to date.

Respectfully submitted,

JENNIFER ARBITTIER WILLIAMS
Acting United States Attorney


_____/s/_____
ROBERT J. LIVERMORE
KATHERINE E. DRISCOLL
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Sentencing Memo was

served upon the following:

John N. Joseph, Esq.
Counsel for TAO LI

_____/s/_____
ROBERT LIVERMORE
Assistant United States Attorney